IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA


GRANT THORNTON, LLP,

    Plaintiff,

v.                                    CIVIL ACTION NO. 1:00-0655

FEDERAL DEPOSIT INSURANCE
CORPORATION,

    Defendant;

and

FEDERAL DEPOSIT INSURANCE
CORPORATION,

    Plaintiff,

v.                                    CIVIL ACTION NO. 1:03-2129

GRANT THORNTON, LLP,

    Defendant.


**REDACTED[1] SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
RELATED TO GRANT THORNTON'S MOTION FOR A SETTLEMENT CREDIT**

**INTRODUCTION**

On March 14, 2007, the court issued findings of fact and
conclusions of law, pursuant to Fed. R. Civ. P. 52.  Thereafter,
on the basis of those findings of fact and conclusions of law,
the court entered judgment in favor of the Federal Deposit

---

[1] Because the Supplemental Findings refer to matters filed
under seal, the court has filed a redacted copy for public
viewing.  A complete and unredacted copy of the Supplemental
Findings is attached as a sealed exhibit to this document.

Insurance Corporation ("FDIC") on its claims against Grant Thornton in the amount of $25,080,777.  Remaining for decision was a determination of the amount of credit, if any, to be given Grant Thornton for the FDIC's settlement with Kutak Rock who served as legal counsel to the First National Bank of Keystone ("Keystone" or "the Bank").  On September 29, 2008, the court granted Grant Thornton's motion for a settlement credit.  The reasons for that decision and the amount of credit follow.

Because this case was tried before the court as a bench trial, the court's findings are presumed to be based on admissible evidence.  Fishing Fleet, Inc. v. Trident Ins. Co., Ltd., 598 F.2d 925, 929 (5th Cir. 1979); see also Chicago Title Ins. Co. v. IMG Exeter Associates Ltd. P'ship, 985 F.2d 553, 1993 WL 27392, at *4 (4th Cir. 1993) (unpublished); see also Harris v. Rivera, 454 U.S. 339, 346 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.").  Accordingly, the court finds it unnecessary to rule on each separate objection raised by the parties.  The court has considered those objections relating to the evidence supporting the findings contained herein and, to the extent such objections relate to the evidence which the court cites in support of its findings, such objections are hereby overruled.

2

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Rule 52(a)(6) of the Federal Rules of Civil Procedure sets forth the standard of review of actions tried without a jury. Rule 52(a) provides that "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."

"It surely does not stretch the language of Rule [52(a)] to characterize an inquiry into what a person knew at a given point in time as a question of `fact.'" <u>Bose Corp. v. Consumers Union of U.S., Inc.</u>, 466 U.S. 485, 498 (1984); <u>see also</u> <u>Investors Title Ins. Co. v. Bair</u>, 2008 WL 4570478, *1 (4th Cir. 2008) ("An inquiry as to what a person knew at a given point in time is a question of fact."). In a bench trial, the court, as the trier of fact, is the sole judge of the credibility of witnesses and its findings are "deserving of the highest degree of appellate deference." <u>Evergreen International, S.A. v. Norfolk Dredging Co.</u>, 531 F.3d 302, 308 (4th Cir. 2008) (quoting <u>United States Fire Ins. Co. v. Allied Towing Corp.</u>, 966 F.2d 820, 824 (4th Cir. 1992)). The reviewing court "must give due regard to the opportunity of the district court to judge the credibility of the witnesses." <u>Multi-Channel TV Cable Co. v. Charlottesville Quality Cable</u>, 65 F.3d 1113, 1122 (4th Cir. 1995). "The trial court, sitting as a trier of fact, has the duty to weigh evidence

3

and draw reasonable inferences and deductions from that evidence." <u>Investors Title Ins. Co. v. Bair</u>, 2008 WL 4570478, *1 (4th Cir. 2008); <u>United States v. Bales</u>, 813 F.2d 1289, 1293 (4th Cir. 1987).

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse the district court's decision even though convinced that it would have weighed the evidence differently. <u>Anderson v. Bessemer City</u>, 470 U.S. 564, 574 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." <u>Id.</u> (citations omitted).

Absent special circumstances, federal district courts must decide questions involving the application of state law even if they are extremely difficult to resolve. <u>Meredith v. City of Winter Haven</u>, 320 U.S. 228, 234-35 (1943). When state law is unsettled, the federal court must attempt to predict how the state's highest court would rule if confronted with the issue. <u>Commissioner of Internal Revenue v. Estate of Bosch</u>, 387 U.S. 456, 465 (1967); <u>Food Lion, Inc. v. Capital Cities/ABC, Inc.</u>, 194 F.3d 505, 512 (4th Cir. 1999); <u>Sanderson v. Rice</u>, 777 F.2d 902, 905 (4th Cir. 1985); <u>Hatfield v. Palles</u>, 537 F.2d 1245, 1248 (4th Cir. 1976).

In the absence of direct authority, the federal court may look to state high court decisions in related or analogous cases for an indication of how the state's highest court is likely to rule. Perez-Trujillo v. Volvo Car Corp. (Sweden), 137 F.3d 50, 55 (1st Cir. 1998). In the absence of other authority, federal courts may follow the considered dicta of the state's highest court. Anderson v. Nissan Motor Co., Ltd., 139 F.3d 599, 601-02 (8th Cir. 1998); State Farm Fire and Cas. Co. v. Fullerton, 118 F.3d 374, 378 (5th Cir. 1997); McKenna v. Ortho Pharm. Corp., 622 F.2d 657, 661-63 (3d Cir. 1980). Additionally, a federal court may examine cases from other jurisdictions to determine what law the controlling state would adopt. Ross v. Creighton Univ., 957 F.2d 410, 414-15 (7th Cir. 1992). "In determining state law, a federal tribunal should be careful to avoid the danger of giving a state court decision a more binding effect than would a court of that state under similar circumstances. Rather, relevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince." McKenna, 622 F.2d at 662 (internal citations and quotations omitted).

Where the issues in this case are somewhat unsettled under West Virginia law, the parties have offered the law of other jurisdictions in an effort to support their respective positions. In making its Conclusions of Law herein, the court has relied on

only those cases which it feels are reflective of the way the West Virginia Supreme Court of Appeals would decide the issue.

## I.  Background

1.  This case arises from the fraudulent operation and eventual collapse of the First National Bank of Keystone.  This case is but one of many that have come before this court in the wake of Keystone's collapse.  See, e.g., Waynesburg College , et al. v. Church, et al., Civil Action No. 1:00-0081; United States v. Cherry, et al., Criminal No. 1:01-0092; United States v. Church, Criminal No. 1:02-0024; City National Bank v. FDIC, et al., Civil Action No. 2:99-0862; United States v. Church, Criminal No. 1:99-0222; United States v. Graham, Criminal No. 1:00-0226; Gariety, et al. v. Grant Thornton, LLP, et al., Civil Action No. 2:99-0992; Gariety, et al. v. Church, et al., Civil Action No. 1:02-0344; Grant Thornton, LLP v. Kutak Rock, LLP, Civil Action No. 1:04-0215; Ellis v. Grant Thornton, LLP, Civil Action No. 1:04-0043; Coast Partners Fin., et al. v. FDIC, Civil Action No. 1:01-0959; FDIC v. Mitchell, Civil Action No. 1:02-1087.

2.  As the court found previously, the Bank's failure was caused in large part by the substantial losses incurred in connection with the securitization of high risk mortgage loans. See also FDIC v. Bakkebo, 506 F.3d 286, 298 (4th Cir. 2007)

(noting that losses from the Bank's collapse totaled approximately $660 million).

3.   On September 1, 1999, the Bank was deemed insolvent and closed and the Comptroller of the Currency appointed the FDIC as receiver.

4.   When the FDIC is appointed receiver of a failed bank it conducts a professional liability investigation of the professionals associated with or that worked for the bank in order to determine if any of them breached fiduciary duties owed to the bank.  Robinson, November 28, 2007, Tr. at 177-78.  Floyd Robinson, an attorney with the FDIC, was the "first line supervisor" with respect to the professional liability investigation surrounding the failure of the First National Bank of Keystone.  Id. at 178.  Mr. Robinson was charged with overseeing the investigation and the pursuit of claims against third parties stemming from Keystone's failure.  See id. at 180. One of the parties investigated by the FDIC was Grant Thornton, Keystone's outside auditor.  On the basis of that investigation, the instant lawsuit was filed.  Also as part of this effort, the FDIC investigated the conduct of Kutak Rock LLP ("Kutak") who served as legal counsel to Keystone.  See id. at 180-82.

## II.  Kutak Rock

5.   In 1993, Kutak Rock, a national law firm of more than 325 lawyers, began serving as legal counsel to The First National

7

Bank of Keystone ("Keystone" or the "Bank").  Lambert Depo.,
September 26, 2002, pp. 10-11 (GT 1080); Lambert Depo., February
12, 2001, pp. 29-43 (FDIC 2175)[2]; Robinson, November 29, 2007,
Tr. at 422.

6.    Michael Lambert, a partner in Kutak's Denver office,
was the partner in charge of Kutak's representation of Keystone.
Lambert Depo, September 26, 2002, pp. 10-11 (GT 1080).  Lambert
has a law degree from UCLA and an MBA from Stanford University.
Lambert Depo., February 12, 2001, pp. 8-10 (FDIC 2175).

7.    Lambert acknowledged that Kutak's client was Keystone -
- not Terry Church or the officers of the Bank.  As such, Kutak
would report to the Board of Directors of Keystone ("the Board").
Lambert Depo, September 26, 2002, p. 11 (GT 1080).

8.    According to Lambert, Keystone was his largest client.
Lambert Depo, September 26, 2002, p. 17 (GT 1080).  For example,
in 1993, Lambert himself billed over 700 hours on Keystone
matters.  Lambert Depo, September 26, 2002, p. 15 (GT 1080).  In
1998, Lambert alone billed over 1,600 hours on Keystone matters.
Lambert Depo, September 26, 2002, pp. 15-16 (GT 1080).  In 1999,
the year the Bank closed, Lambert billed 1,250 hours.  Lambert
Depo, September 26, 2002, p. 16 (GT 1080).  Kutak billed Keystone
for over $1.5 million in fees during 1998 and 1999.  Lambert

---

[2] Grant Thornton also offered Mr. Lambert's February 12, 2001
deposition as GT Exhibit 1073.

Depo, September 26, 2002, p. 16 (GT 1080).  Lambert coordinated

the services that other Kutak attorneys provided to the Bank.

Lambert Depo, September 26, 2002, pp. 10-11 (GT 1080); see also

FDIC Exs. 2001, 2002, 2003, 2006.

    9.  Beginning in 1993, Kutak provided legal services

related to the design and execution of Keystone's securitization

program.  Lambert Depo., February 12, 2001, pp. 40-43, 99-102,

130-31 (FDIC 2175); FDIC Exs. 2001, 2006.  In early 1996, Kutak's

representation of Keystone expanded to take on additional

responsibilities related to the securitization business.  Lambert

Depo., February 12, 2001, p. 131 (FDIC 2175); FDIC Ex. 2001.

Lambert was "intimately involved" in the securitizations.  Quay,

November 27, 2007, Tr. at 77-78.  By 1997, and continuing until

the Bank's failure, Kutak provided not only securitization

representation but general, transactional, and regulatory

representation as well.  Lambert Depo., February 12, 2001, pp.

130-34 (FDIC 2175); Kaufman Depo., January 10, 2003, pp. 83-85

(GT Ex. 1068); Halsey Depo., May 23, 2001, pp. 86-87 (GT Ex.

1065); FDIC Exs. 2001, 2002, 2003, 2006; Quay, November 27, 2007,

Tr. at 53.  Employees of the Bank had almost daily contact with

Lambert.  Pack Depo., September 13, 2002, pp. 204-05, 209 (GT

1071).

    10.  Lambert and Kutak were introduced to Keystone by Daniel

Melgar, the architect of Keystone's securitization program.

Lambert Depo., February 12, 2001, pp. 38-39 (FDIC 2175); Melgar Depo., July 23, 2002, pp. 72-73 (FDIC 2164); Pack Depo., September 13, 2002, pp. 208-09 (GT 1071).  At that time, Melgar headed up an organization called Coast Partners, the entity assisting Keystone in acquiring loans for securitization. Lambert Depo., February 12, 2001, pp. 26-28 (FDIC 2175); Melgar Depo., July 22, 2002, p. 16 (GT 1070).  Coast Partners and Melgar were responsible for putting Keystone together with not only the originators of the loans, but also the servicers.   Melgar Depo., July 23, 2002, pp. 72-75 (FDIC 2164); Pack Depo., September 13, 2002, pp. 31-32 (GT 1071); Mannes Depo., August 19, 2002, pp. 25-26, 32-33 (FDIC Ex. 2168).  Melgar knew that Keystone personnel had no experience in the securitization area and that they were relying on him for advice and assistance.  Melgar Depo., July 22, 2002, pp. 39-40 (GT 1070).  To that end, Coast Partners and Melgar assisted Keystone in establishing a national conduit program for the purchase of Title I loans, marketing the program to originators and wholesalers, negotiating the purchase and repurchase of loans, and acting as a financial advisor and co-manager on the securitizations.  Id. at 73-75.  Keystone paid Coast Partners various fees at the closing of each transaction. Id. at 215-16.  Over time, Coast Partners received millions of dollars from Keystone based upon their arrangement.  Id. at 209-36.

11.   During the course of its investigation of Kutak's conduct vis à vis Keystone, the FDIC accumulated substantial evidence to support claims against Kutak for attorney malpractice and breach of fiduciary duty.  Robinson, November 28, 2007, Tr. at 181.  This evidence centered around a number of troubling and/or suspicious occurrences, i.e., "Red Flags", of which Kutak was aware and failed to inform Keystone's Board.  Id. 189-99.

12.   By early 2002, Floyd Robinson felt that the FDIC had sufficient evidence of wrongdoing to present its claims to Kutak.  Robinson, November 28, 2007, Tr. at 181-83.

### III.  Settlement

13.   On April 18, 2002, United States Magistrate Judge Mary E. Stanley ordered the FDIC, as receiver for the First National Bank of Keystone, Kutak, and Michael Lambert to participate in mediation on April 23, 2002.  Magistrate Judge Stanley directed the parties to "submit to the court ex parte and in camera a list of claims and disputes between the parties, with a brief statement of how each claim or dispute would be proven, defended, and argued."  The submission was to be identified prominently and clearly as "Mediation Materials" and limited to five (5) pages.  FDIC Exhibit 2127; Floyd Robinson, November 28, 2007, Tr. at 188-89.

14.   In accordance with Magistrate Judge Stanley's Order, the FDIC submitted a mediation position paper on April 22, 2002.

11

FDIC Exhibit 2128; Floyd Robinson, November 28, 2007, Tr. at 189. This mediation paper laid out the various "Red Flags" that, according to the FDIC, triggered a duty on the part of the Kutak and Lambert to inform the Bank's Board of Directors.  FDIC Exhibit 2128; Floyd Robinson, November 28, 2007, Tr. at 189.  The claims set forth in the mediation paper and the losses outlined therein, primarily based on losses related to securitizations, were the ones pursued by the FDIC in the mediation and other meetings between the FDIC and Kutak.  FDIC Exhibit 2128; Floyd Robinson, November 28, 2007, Tr. at 197-203.

15.  Magistrate Judge Stanley conducted the mediation and actively supervised the continuing negotiations between the FDIC and Kutak.  FDIC Exs. 2129, 2130, 2131, 2132, 2133, 2134, 2135, 2136, and 2137; Floyd Robinson, November 28, 2007, Tr. at 214. Settlement negotiations between Kutak and the FDIC continued from March of 2002 until May of 2003.  Floyd Robinson, November 28, 2007, Tr. at 183, 214.  As a result of these efforts, Kutak Rock and the FDIC reached a settlement agreement dated May 23, 2003. FDIC Ex. 2141.  This settlement was reached prior to the FDIC filing a lawsuit against Kutak.

16.  REDACTED

12

17.  The settlement agreement provided that Kutak's primary insurer, Executive Risk Indemnity Inc., would immediately pay the FDIC the remaining policy limits of $8,000,000.00.  Kutak also signed a $4 million promissory note bearing 3% interest, payable to the FDIC in four equal annual installments of $1 million plus interest.  FDIC Exhibits 2141, 2142; Floyd Robinson, November 28, 2007, Tr. at 185.

18.  In addition, Kutak and the FDIC agreed to cooperate in pursuing a $10 million claim on Kutak's excess insurance policy with Reliance Insurance Company which was in receivership in Pennsylvania.  The FDIC and Kutak further agreed that if the FDIC received less than $8 million as a result of the Reliance claim, Kutak would make up a portion of the shortfall according to a formula set forth in a second promissory note executed by Kutak. Robinson, November 28, 2007, Tr. at 185-87.[3]

---

[3] According to the promissory note, attached as an exhibit to the settlement agreement,

> if recovery from the Reliance Liquidation Estate is $1,000,000 or less, then the Principal amount of this Note shall be $2,750,000; if recovery from the Reliance Liquidation Estate is $1,000,001 to $2,999,999, then the Principal amount of this Note shall be $2,625,000; and if recovery from the Reliance Liquidation Estate is $3,000,000 or more, then the Principal amount of this Note shall be 50% of the difference between $8,000,000 and the recovery from the Reliance Liquidation Estate (50% x ($8,000,000 less the recovery from the Reliance Liquidation Estate)).

FDIC Ex. 2142.

19.   The FDIC has so far received $12,942,521 (inclusive of interest) under the settlement agreement.[4]   Potter, November 27, 2007, p. 330; Robinson, November 28, 2007, Tr. at 185-86.   If the FDIC receives no other payments from the Reliance Liquidation, the FDIC is guaranteed to receive an additional $2,750,000, not including interest.   FDIC Ex. 2142.   Therefore, the FDIC is guaranteed to recover at least $15,692,521 under the settlement agreement.

20.   Under the settlement agreement, Kutak also agreed that Lambert was permanently banned from representing FDIC insured banks and made certain promises to the FDIC regarding Kutak's procedures in handling future representation of FDIC insured banks.   FDIC Ex. 2141.   Robinson, November 28, 2007, Tr. at 220-21.

21.   In the settlement agreement, the FDIC released all claims against Kutak "arising out of or relating in any way, either directly or indirectly, to the Pending Litigation, to the Keystone Matter, or the representation of Keystone by Kutak Rock, including Lambert."   FDIC Ex. 2141.   Robinson, November 28, 2007, Tr. at 188.   This type of general release is used by the FDIC in "virtually every settlement [it] enter[s] into.   Robinson, November 28, 2007, Tr. at 188.

---

[4] This amount includes a March 2008 payment of $800,000 from the Reliance receivership.

<u>IV.   Third Party Complaint</u>

22.  On April 3, 2003, prior to the FDIC and Kutak executing their settlement agreement, Grant Thornton sought leave in the case at bar to file a third party complaint for contribution against Kutak.  <u>See</u> Doc. #1069 in Civil Action No. 2:99cv992.  In so doing, Grant Thornton wanted "to assert claims against Kutak for contribution, fraud, negligent misrepresentation and tortious interference with contract."  <u>Id.</u>  Grant Thornton contended that its "contribution claims are derivative of the claims brought against Grant Thornton by the Federal Deposit Insurance Corporation ["FDIC"]."  <u>Id.</u>  Grant Thornton also requested that the court enter an order giving it a credit for 22 million dollars, which it contended was the amount of the FDIC/Kutak Rock settlement.  <u>See</u> Doc. #1213 in Civil Action No. 2:99cv992.

23.  By Order entered December 4, 2003, the court scheduled a telephone conference on "issues related to the FDIC's settlement with Kutak Rock" for December 9, 2003.

24.  Present on that telephone conference were lawyers for the FDIC, Grant Thornton, Kutak Rock, and members of the court family.  During that telephone conference, counsel for Grant Thornton conceded the good faith nature of the settlement.  The conference was not on the record.

25.  Based on the court's understanding of Grant Thornton's concession at the hearing, by Order dated December 11, 2003, the

court denied Grant Thornton's motion to file a third-party
complaint because under West Virginia law, "a non-settling
defendant's right of contribution from a joint tortfeasor is
terminated by a settlement between the plaintiff and such
tortfeasor before verdict."  Smith v. Monongahela Power Co., 429
S.E.2d 643, 648 (W. Va. 1993); Board of Education of McDowell
County v. Zando, Martin & Milstead, Inc., 390 S.E.2d 796, 805 (W.
Va. 1990) ("[A] party in a civil action who has made a good faith
settlement with the plaintiff prior to a judicial determination
of liability is relieved from any liability for contribution.").
The court further ordered that "if and when a judgment is entered
against Grant Thornton, Grant Thornton will receive dollar-for-
dollar credit to the extent the claims against itself and Kutak
Rock were based on a single indivisible loss."  Order of December
11, 2003, p. 4 (emphasis in original).   Finally, given that
trial in the FDIC v. Grant Thornton case was fast approaching,
the court found that any direct claims Grant Thornton had against
Kutak Rock should be addressed in another lawsuit.

    26.  Thereafter, on January 8, 2004, Grant Thornton filed a
"Statement of Position With Respect to Court's December 11, 2003
Order" in which it stated that "Grant Thornton has not and does
not concede the good faith nature of the settlement."

    27.  At a hearing on January 16, 2004, the court took up
Grant Thornton's "Statement of Position."  Counsel for Grant

16

Thornton contended that he had not conceded the good faith nature of the FDIC/Kutak settlement.  Transcript of January 16, 2004 Hearing, 1:00cv655, 1:03cv2129, 1:04cv0043, at p. 5-6.[5]

28.  After hearing from counsel for all parties, the court decided to allow Grant Thornton, if it wished to do so, "to make a submission by way of affidavits or otherwise, but without additional discovery at this point. . . of [Grant Thornton's] basis in fact for attacking the bona fides of [the FDIC/Kutak] settlement."  Transcript of January 16, 2004 Hearing, 1:00cv655, 1:03cv2129, 1:04cv0043, at p. 63.  The court further ordered that, upon receipt of the additional materials, it would decide whether to hold a hearing or permit discovery on the "good faith" issue.  See id.

29.  In support of its position that the Settlement was not made in good faith, Grant Thornton offered the following exhibits: 1) the Settlement; 2) settlements entered into between the FDIC and various other defendants in this litigation; 3)Kutak's proof of claim filed in connection with the Reliance

_____

[5] Everyone else present on the telephone conference - - including four lawyers on behalf of the FDIC, two lawyers from Kutak Rock, the undersigned, and the court's law clerk - - agree that counsel for Grant Thornton (Mr. Tinney) conceded that it had no reason to believe the settlement was not made in good faith. Furthermore, counsel for Grant Thornton did not clear up what it later contended was a misunderstanding of what Mr. Tinney had said when it was restated by the FDIC.  Transcript of January 16, 2004 Hearing, 1:00cv655, 1:03cv2129, 1:04cv0043, at p. 5-6.

Insurance proceeding; and the declaration of Stanley J. Parzen, counsel for Grant Thornton.  In his declaration, Mr. Parzen stated that Floyd ("Rob") Robinson of the FDIC told him the "Board of the FDIC had not given inside counsel for the FDIC any settlement authority with respect to the FDIC claims against GT . . . due to animus among certain board member(s) with respect to GT."  Declaration of Stanley J. Parzen, January 26, 2004, at 1-2.

30.   In response, the FDIC offered the declaration of Mr. Robinson in which he declared:

> I never stated, as Mr. Parzen represents, that "in most cases the Board of the FDIC gave inside counsel for the FDIC settlement authority (though settlements had to be taken back to the Board for final authorization)."  The FDIC Board has written delegations in place delegating settlement authority in cases like this jointly to the Legal Division and to the Division of Resolutions and Receiverships. Moreover, in such cases, requests for authority to settle do not have to be "taken back to the Board" but may be authorized at a level below the Board depending on the settlement amount involved.

> I never stated, either at the March 19 conference or at any other time, that the Board's retention of settlement authority "was due to animus among certain board member(s) with respect to GT" as Mr. Parzen represents.

Declaration of Floyd I. Robinson, February 3, 2004, at 3.  In his declaration, counsel for the FDIC, David Mullin, "state[d] unequivocally that the FDIC's settlement with Kutak was in no way intended to disadvantage Grant, preclude Grant from receiving a fair trial, or interfere with Grant's ability to pursue any

18

direct claims it may have against Kutak.  Nor did the FDIC have corrupt intent or engage in collusion, dishonesty, fraud, or other tortious conduct in negotiating or executing the settlement agreement with Kutak."  Declaration of David Mullin, February 3, 2004, at 8.

31.  Finally, Kutak Rock made a submission to the court regarding the issue of whether the Settlement was made in good faith.  Kutak offered the Declaration of Joseph Warin, its attorney during the settlement negotiations.  Mr. Warin testified regarding the evolution of the Settlement and its terms.  Declaration of F. Joseph Warin, February 4, 2004.  Mr. Warin's declaration gave the court no reason to believe that the Settlement was not made in good faith.

32.  Because the court found that Grant Thornton had not even made a prima facie case in support of its position that the settlement between the FDIC and Kutak Rock was not made in good faith, Grant Thornton's motion for additional discovery on this point was denied and the court declined to revisit its Order of December 11, 2003.  Even though no written order was entered, the court's failure to allow Grant Thornton to conduct discovery regarding the good faith nature of the FDIC/Kutak Rock settlement and its unwillingness to vacate its December 11, 2003 Order makes clear that Grant Thornton failed to persuade the court that it

had an arguable basis for attacking the good faith nature of the settlement.

<u>V.  Procedure for Determination of Settlement Credit</u>

33.  After hearing from the parties as to the procedure to be employed by the court in determining the amount of a settlement credit to be given, by Order May 24, 2007, the court decided to conduct an evidentiary hearing "of not more than four days" on the issue.  <u>See</u> Order of May 24, 2007.  "Each side [was] limited to a maximum of two days and no more than two witnesses without prior approval of the court."  <u>Id.</u>  Given its intimate knowledge of the case, the court determined that such a hearing would be sufficient to allow the court to make an independent allocation of the settlement.  <u>Bowers v. Kuse</u>, 1998 WL 957455, *7 (4th Cir. 1998) (unpublished).

34.  During the hearing and despite the court's restrictions, the FDIC put forth substantial evidence to support its claims against Kutak.  The basic premise of the FDIC's claims against Kutak was that in the course of its representation of Keystone during the period from 1993 to 1999, 1) that Kutak had numerous conflicts of interest; 2) that Kutak became aware of at least nine major "Red Flags" regarding Keystone's securitization program; 3) that Kutak should have disclosed the conflicts or the red flags to Keystone's Board of Directors; 4) that Kutak should have withdrawn from closing any further securitization

20

transactions; and 5) that disclosure of the red flags and/or withdrawal by Kutak would have resulted in either the termination or curtailment of the securitization program or closure of the bank and the avoidance in over $300 million in losses suffered by Keystone as a result of the securitization program as well as additional operating losses suffered by Keystone and losses suffered by Keystone in connection with its acquisition of Prime Financial Corporation ("Prime"). At the hearing, the FDIC presented evidence regarding the "Red Flags" which Kutak ignored.

35.  *THE FIRST RED FLAG*.  The very first loan originator, servicer and deal partner that Melgar brought to Keystone was Master Financial.  In 1993, during the pendency of Keystone's first securitization, HUD wrote a letter to Master Financial accusing it of fraud, including the falsification of borrower information, allowing borrowers to misuse loan payments, and the "fronting" of loan payments.  Lambert Depo., February 12, 2001, pp. 139-42, 149, 154-59, 163-64 (FDIC 2175); Robinson, November 28, 2007, Tr. at 235, 255-60.  "Fronting" is a common scam in the consumer lending industry in which loan originators use either loan proceeds or their own funds to make the payments on poor quality loans to create the appearance of performance so that the loans will be purchased by unsuspecting entities such as Keystone.  Graham Depo., August 20, 2002, pp. 57-59 (GT 1076).  Lambert received a copy of this letter.  Lambert Depo., February

21

12, 2001, pp. 149, 154 (FDIC 2175).  Instead of informing
Keystone's Board of Directors about the serious problems with
Master Financial, Lambert proceeded to close the securitization
containing the questionable Master Financial loans.  Lambert
Depo., February 12, 2001, pp. 149-50, 154-59, 163-65, 172-73,
191-92, 199-202, 207, 209-11, 231-32, 241 (FDIC 2175).  The first
red flag reflects that the loans going into Keystone's
securitizations were of poor quality, that Master Financial was
dishonest, and that the residual valuations were overstated.
FDIC Exs. 2145, 2153, 2161, 2162; Quay, November 27, 2007, Tr. at
78-79; Lambert Depo., February 12, 2001, pp. 139-42, 157, 210-11
(FDIC 2175); Lambert Depo., February 13, 2001, 253-54 (FDIC
2176)[6]; Bandoian, November 27, 2007, Tr. at 155.

    36.  _THE SECOND RED FLAG_.  After Master Financial exited,
Melgar recruited Conti Financial to be Keystone's new
securitization partner.  Mannes Depo., August 19, 2002, pp. 17-19
(FDIC Ex. 2168).  At the end of 1994, after four securitizations,
Conti determined that the program was a losing proposition and
decided to withdraw from the securitization program.  Mannes
Depo., August 19, 2002, pp. 64-66, 109-12, 116-121, 132-36 (FDIC
Ex. 2168); Graham Depo., August 20, 2002, p. 48 (GT Ex. 1076);
Pack Depo., September 13, 2002, p. 149 (GT 1071); Sauerwein

---

    [6] Grant Thornton also offered Mr. Lambert's February 13,
2001 deposition as GT Exhibit 1074.

Depo., July 31, 2002, pp. 31-32, 39-41, 53-58, 68-69 (FDIC Ex. 2170).  Believing that Melgar had made misrepresentations about the securitization deals, Conti also asked Melgar to find a buyer for the residuals it owned.  Mannes Depo., August 19, 2002, pp. 139-40 (FDIC Ex. 2168).  Keystone told Conti it could not buy the Conti residuals.  Mannes Depo., August 19, 2002, p. 117 (FDIC Ex. 2168).  However, Melgar, Harald Bakkebo[7], and Ron Mitchell formed an entity - - Ronhardan - - for the specific purpose of purchasing the Conti residuals at a price of $6 million.  Church Depo., August 27, 2002, pp. 506-10 (FDIC Ex. 2172); Melgar Depo., July 23, 2002, pp. 179, 185 (FDIC 2164); Mannes Depo., August 19, 2002, pp. 116, 140 (FDIC Ex. 2168).  Lambert represented Ronhardan in connection with its purchase of the Conti residuals.  Lambert Depo., February 13, 2001, pp. 264-69 (FDIC 2176).  Melgar et al. signed four notes payable to Keystone totaling $8 million - - the notes falsely represented that the funds were being borrowed for "consumer" purposes.  Melgar Depo., July 23, 2002,

---

[7] Harald Bakkebo was "a close friend and business associate" of Melgar and Melgar directed much of Keystone's securitization business to entities controlled by Bakkebo.  FDIC v. Bakkebo, 506 F.3d 286, 289-90 (4th Cir. 2007).  On August 29, 2002, the FDIC filed suit against Bakkebo (and others) alleging that Bakkebo had engaged in fraud and civil conspiracy to commit fraud against Keystone.  See id. at 291.  After a six-day trial, the jury found in favor of the FDIC and the court entered judgment against Bakkebo in the amount of $161 million.  See id. at 289-92.  The judgment against Bakkebo was affirmed by the appeals court.  See id. at 298.

pp. 182, 185-89 (FDIC 2164)[8]; Church Depo., August 27, 2002, p. 506 (FDIC Ex. 2172); Lambert Depo., February 13, 2001, pp. 305-08 (FDIC 2176).  After the closing, Church told Lambert that the $8 million in notes only represented a $4 million obligation of Melgar et al. and that the personal notes of Melgar, Bakkebo, and Ron Mitchell were intended only as guaranties.  Lambert Depo., February 13, 2001, pp. 305-08 (FDIC 2176).  Although Lambert admitted this arrangement did not seem in accord with "standard banking practices," he took no steps to inform Keystone's Board. Lambert Depo., February 13, 2001, pp. 313-15 (FDIC 2176).  The second red flag shows that the securitizations were not performing well, that the Bank's records were being falsified, and that the Bank was violating federal banking regulations. Quay, November 27, 2007, Tr. at 80-81; Lambert Depo., February 13, 2001, pp. 271, 305-08, 309, 311-15, 369-79 (FDIC 2176).

37.  *THE THIRD RED FLAG*.  For a time, Prime Financial was one of the loan servicers in connection with Keystone's securitization program.  Melgar Depo., July 22, 2002, pp. 237-38 (GT 1070).  Harald Bakkebo owned Prime.  Melgar Depo., July 22, 2002, pp. 237-38 (GT 1070).  In December 1995, Bakkebo was indicted on federal insurance fraud charges in Louisiana.  Melgar Depo., July 22, 2002, p. 238 (GT 1070); Lambert Depo., February

---

[8] Grant Thornton also offered Mr. Melgar's July 22, 2002 and July 23, 2002 depositions as GT Exhibit 1070.

13, 2001, p. 403 (FDIC 2176); Graham Depo., August 20, 2002, p. 60 (GT 1076).  The indictment sought forfeiture of Prime Financial.  Oosthuizen Depo., July 10, 2003, p. 32 (FDIC 2165); Robinson, November 28, 2007, Tr. at 260-68; FDIC Exs. 2057, 2065, 2070, 2071, 2078.  Bakkebo made a sham transfer of his ownership in Prime to his son, and then to an offshore entity run by Pieter Oosthuizen.  Bernabe Depo., August 28, 2002, pp. 141-51 (FDIC 2163A); Oosthuizen Depo., July 10, 2003, pp. 40-54 (FDIC 2165); Graham Depo., August 20, 2002, pp. 64-67 (GT 1076); Lambert Depo., February 13, 2001, pp. 452-54 (FDIC 2176).  Melgar acted as CEO of Prime in negotiating the sale of Prime to Keystone.  Melgar Depo., July 23, 2002, pp. 334-35 (GT 1070).  While Lambert recognized the Bank's interests were in jeopardy, he never brought it to the attention of the Board.  Quay, November 27, 2007, Tr. at 81.

    38.  *THE FOURTH RED FLAG*.  At some point, Bakkebo spun off the loan origination portion of Prime and formed a new entity, Clearview Capital.  Doyle Depo., July 21, 2003, p. 53 (FDIC 2166).  All the loans Clearview originated were sold to Keystone and, in turn, serviced by Prime.  Doyle Depo., July 21, 2003, pp. 53-55 (FDIC 2166).  While the sale of Prime to Keystone was in the works, Prime's president, Rob Bernabe, confessed that Bakkebo and two Clearview officers, Todd Zeras and Michelle Bowling, had been fronting loan payments to Prime as part of a scheme to

25

defraud Keystone.  Bernabe Depo., August 28, 2002, pp. 156-70
(FDIC 2163A); Doyle Depo., July 21, 2003, pp. 61-100 (FDIC 2166);
Graham Depo., August 20, 2002, pp. 57-59 (GT 1076); FDIC Exs.
2075, 2076, 2078.  Kutak partner, Alan Strasser, undertook to
draft a federally required Suspicious Activity Report, which in
early drafts contained a fairly accurate version of the truth.
Unfortunately, by the time Lambert completed the report, it had
been so sanitized that it didn't even disclose that Bakkebo owned
Clearview.  FDIC Exs. 2075, 2076, 2078, 2082, 2084.  Instead of
seeking to have Bakkebo indicted or ending Keystone's
relationship with Melgar, Prime, and Clearview, Lambert
negotiated the sale of Prime's assets to Keystone for the grossly
inflated price of $8 million, cancelled Bakkebo's $1.6 million in
notes, and provided a cash payment to Bakkebo.  Floyd Robinson,
November 28, 2007, Tr. at 242-43, 264-77.  Lambert reported none
of this information to Keystone's Board.  Floyd Robinson,
November 28, 2007, Tr. at 242-43, 264-77.  The fourth red flag
reflects that Keystone's assets were inflated and it calls into
question the integrity of the loan data underlying the
securitization.  Quay, November 27, 2007, Tr. at 82-83.  Zeras
and Bowling started their own company, Tripoint, which became
Keystone's new largest loan originator. Robinson, November 28,
2007, Tr. at 277.  Lambert did not advise or inform Keystone's

Board or auditors.  Robinson, November 28, 2007, Tr. at 242-43, 264-77.

39.  _THE FIFTH RED FLAG_.  In early 1997, CAPMAC, an insurer of Keystone's securitizations, decided to withdraw from the program based on their poor performance.  Lewis Depo., July 30, 2002, pp. 66-67 (FDIC Ex. 2167); Pack Depo., September 13, 2002, pp. 128-29 (GT 1071).  CAPMAC officer, Clifton Lewis, told Lambert that Keystone's "deals were blowing up," and that the "Bank's performance is awful, everyone knows it."  FDIC Exs. 2147 and 2149.  CAPMAC eventually quit insuring Keystone deals at the end of 1996 because it "made the ultimate underwriting decision that it was not a risk that [CAPMAC was] comfortable with." Lewis Depo., July 30, 2002, pp. 66-67 (FDIC Ex. 2167); Pack Depo., September 13, 2002, pp. 128-29, 154 (GT Ex. 1071). Lambert made no report of CAPMAC's concerns to Keystone's Board.

40.  _THE SIXTH RED FLAG_.  Lambert knew the OCC had an issue regarding inappropriate appraisal fees paid to Terry Church and had made a referral to the FBI.  Members of the Board were not made aware of this until 1999 or, in some circumstances, after the Bank closed.  FDIC Ex. 2026; Lambert Depo., February 13, 2001, p. 415-16 (FDIC Ex. 2176); Lambert Depo., September 26, 2002, pp. 207-08 (GT 1080); Kaufman Depo., January 10, 2003, pp. 34-36 (GT Ex. 1068); Budnick Depo., December 13, 2002, pp. 28-30

27

(GT Ex. 1069); Pack Depo., September 13, 2002, pp. 9-24 (GT
1071).

41. *THE SEVENTH RED FLAG*.  In 1996, Melgar associate, Ron
Mitchell, left Coast Partners to take a position with Keystone as
a consultant.  Church Depo., August 29, 2002, pp. 824-25 (FDIC
Ex. 2172); Lambert Depo., February 13, 2001, pp. 315-18 (FDIC Ex.
2176).  Lambert drafted Mitchell's contract with Keystone which
provided for a term of five years at a yearly salary of $1.5
million, plus bonuses.  Church Depo., August 29, 2002, pp. 824-25
(FDIC Ex. 2172); Lambert Depo., February 13, 2001, pp. 316-17
(FDIC Ex. 2176).  Subsequently, Mitchell became Keystone's Chief
Financial Officer (CFO) and was paid a salary of $25,000.00 per
month in that capacity.  Lambert Depo., February 13, 2001, pp.
318-19, 393 (FDIC Ex. 2176).  Sometime after his appointment as
CFO, Mitchell confided in Lambert that he did not have the
qualifications for the position of CFO.  Lambert Depo., February
13, 2001, pp. 319-20, 392-95 (FDIC Ex. 2176).  In November of
1998, Mitchell informed Lambert that he was merely a sham CFO,
that he had been assigned no duties nor given any information to
do his job, that he didn't have the qualifications for the job,
and that Church had merely hired him to appease the OCC, which
had expressed concern about Keystone's lack of a qualified CFO.
Lambert Depo., February 13, 2001, pp. 319-20, 392-95 (FDIC Ex.
2176).  Lambert made no effort to disclose this information to

28

Keystone's Board of Directors.  Lambert Depo., February 13, 2001, pp. 394-96 (FDIC Ex. 2176); Rago Depo., November 22, 2002, pp. 34-35 (GT Ex. 1067);  FDIC Exs. 2109, 2154 ¶ 40f; Gibson Depo., August 22, 2002, pp. 48-50 (GT Ex. 1083).

42.  *THE EIGHTH RED FLAG*.  Beginning in late 1997, Lambert participated in a series of efforts by Keystone to secure financing so that it might execute a spin-off of Keystone Mortgage Company.  Lambert Depo., September 26, 2002, pp. 28-35, 80-85 (GT Ex. 1080); FDIC Ex. 2002.  As part of these efforts, Keystone engaged Banc One to help secure financing.  Aramburu Depo., September 6, 2002, pp. 16-24 (FDIC Ex. 908).  Keystone's interest in the residuals, as its primary asset, was to serve as primary collateral for any loan it received.  Aramburu Depo., September 6, 2002, pp. 24-26, 37-38 (FDIC Ex. 908).  Banc One calculated the present value of Keystone's residual interest on the 1993 and 1994 securitizations to be negative $2.2 million.  Aramburu Depo., September 6, 2002, p. 33 (FDIC Ex. 908).  Banc One's estimation of the present value of the 1995-2 through 1996 transactions was negative $1.1 million.  Aramburu Depo., September 6, 2002, pp. 34-35 (FDIC Ex. 908).  Banc One's valuation of the 1997 residuals showed a present value of approximately $29 million.  Aramburu Depo., September 6, 2002, p. 35 (FDIC Ex. 908).  Keystone was attempting to secure $200 million in financing.  Aramburu Depo., September 6, 2002, p. 38

29

(FDIC Ex. 908).  Given Banc One's valuation of the residuals at approximately $26 million, it determined that it would be impossible to secure $200 million in financing.  Aramburu Depo., September 6, 2002, pp. 38-39 (FDIC Ex. 908).  Thereafter, Banc One also looked into undoing the securitizations and selling the underlying loans.  Aramburu Depo., September 6, 2002, pp. 40-41 (FDIC Ex. 908).  Banc One came to the conclusion that the quality of the underlying loans was marginal and was unable to find a buyer for the loans.  Aramburu Depo., September 6, 2002, pp. 66-69 (FDIC Ex. 908).  Lambert and Kutak were intimately involved in the efforts to secure financing for the proposed spin-off as evidenced by Kutak's billing records which indicated that the firm, and especially Lambert, spent substantial time on the matter.  FDIC Ex. 2002;  Rago Depo., November 22, 2002, pp. 146-47 (GT Ex. 1067).  Although these problems should have been disclosed to the Board, neither the inability to find a buyer for the loans nor the Banc One devaluation of Keystone's residuals was ever disclosed to Keystone's Board by Lambert or anyone else at Kutak.  Quay, November 27, 2007, Tr. at 84-85.

43.  *THE NINTH RED FLAG*.  In 1998, Lambert attended a meeting with Lehman Brothers, Keystone's securitization underwriter at the time.  At the meeting, a representative of Lehman disclosed that Keystone made no money from its securitization business.  Graham Depo., August 19, 2002, pp. 173-

30

77 (FDIC Ex. 1072).  Lambert did not report this to Keystone's
Board, but instead his firm drafted a proxy statement for
Keystone reporting to the public and the Board that "a
significant portion of the Bank's profit resulted from its
securitization business."  Lambert Depo, September 26, 2002, pp.
196-98 (GT Ex. 1080); FDIC Ex. 248.

44.  Kutak had a duty to disclose the foregoing red flags to
Keystone's Board.  Quay, November 27, 2007, Tr. at 85-86;
Bandoian, November 27, 2007, Tr. at 148-50.  Indeed, Kutak itself
recognized its duty to make a full disclosure to the Board.  FDIC
Ex. 2163.  As Kutak partner Matthew Ash wrote to Lambert, "Where
we have seen situations in the past where the Board has made
decisions without the full appreciation of the possible
consequences and we suspect that management may not have, in this
case at least, addressed the safety issues, don't we do a
disservice to the board by not forcing them to confront the
issues?"  FDIC Ex. 2163.

45.  Kutak failed to disclose to Keystone's Board of
Directors the nine red flags or other frauds against Keystone and
continued to assist Keystone's management in closing transactions
that Kutak knew were harmful to Keystone.  Lambert in fact asked
Wendy Pack if anything illegal was going on at the Bank.  Pack
told Lambert to talk to Church about his question.  Lambert did
not express his concerns to the Board.  FDIC Exs. 2121, 2126,

2148; Pack Depo., September 13, 2002, pp. 205-06 (GT 1071);
Lambert, February 13, 2001, pp. 253-54, 314-15, 371-72, 381-82,
394-95, 432 (FDIC 2176); Lambert, February 14, 2001, pp. 488-90,
582-83 (FDIC 2177).  Kutak never informed the Board of problems
with Bakkebo, Clearview, or Melgar.  Halsey Depo., May 23, 2001,
p. 88 (GT 1065); Halsey Depo., December 4, 2002, p.132 (GT Ex.
1066).

46.  The Board placed tremendous confidence in Lambert and
Kutak and, had the red flags been disclosed to it, there is
substantial evidence that the Board or the regulators would have
taken action to curtail or terminate the securitization program
and/or closed the Bank.  Quay, November 27, 2007, Tr. at 62, 88;
Church Depo., August 26, 2002, p. 162 (FDIC 2172); Church Depo.,
August 29, 2002, pp. 821-22 (FDIC 2172); Bandoian, November 27,
2007, Tr. at 112, 124-25, 148-51.

47.  By 1996, Lambert had sufficient knowledge of problems
with and/or wrongdoing related to the Bank's securitization
program that he should have gone to the Board.  Robinson,
November 28, 2007, Tr. at 209-14, 223; Quay, November 27, 2007,
Tr. at 85-86.

## VI.  Attorney Malpractice

"An attorney who undertakes to perform professional services for a client is required to exercise the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession in similar circumstances."  Keister v. Talbott, 391 S.E.2d 895, 898 (W. Va. 1990).  To prevail on a claim of legal malpractice, a plaintiff must prove three things:  (1) the attorney's employment; (2) his neglect of a reasonable duty; and (3) that such negligence resulted in and was the proximate cause of loss to the client.  See id. at 898-99;  Armor v. Lantz, 535 S.E.2d 737, 746 (W. Va. 2000).

Grant Thornton argues that Kutak had no duty to inform Keystone's Board of the risk involved in the securitizations and the troubling issues surrounding the transactions and the players involved.  Grant Thornton is wrong.  A lawyer has "a duty to disclose anything known to him which might affect his client's decision `whether or how to act.'" Musselman v. Willoughby Corp. 337 S.E.2d 724, 728 (Va. 1985) (quoting Owen v. Shelton, 277 S.E.2d 189, 191 (Va. 1981)).  As West Virginia's highest court has stated:

> An attorney owes to his client the high duty to diligently, faithfully and legitimately perform every act necessary to protect, conserve and advance the interests of his client.  No deviation from that duty can be permitted.  That principle of conduct is a stern and inflexible rule controlling the relationship of attorney and client so long as the relation exists.

33

<u>Bank of Mill Creek v. Elk Horn Coal Corp.</u>, 57 S.E.2d 736, 748 (W.
Va. 1950); <u>see also</u> <u>FDIC v. Martin</u>, 801 F. Supp. 617, 620 (M.D.
Fla. 1992) ("A person acting in a fiduciary or confidential
capacity has a duty to make a full and fair disclosure of
material facts to a person reposing confidence in him.").   In
light of this direction from the West Virginia Supreme Court of
Appeals, the court finds unpersuasive Grant Thornton's argument
that Kutak Rock had no duty to inform Keystone's Board regarding
the red flags information.[9]

### VII.  Damages Attributable to Kutak

The objective of awarding damages for negligent conduct is
to put the plaintiff, insofar as possible, in the same position
it would have been in if the tort had not been committed.   <u>Hannah
v. Heeter</u>, 584 S.E.2d 560, 571 (W. Va. 2003).   Recoverable
damages are limited to those that can reasonably be expected to
flow from the tortious conduct.   <u>Mueller v. American Electric
Power Energy Services, Inc</u>., 589 S.E.2d 532 (W. Va. 2003).

---

[9] Grant Thornton contends that the FDIC was required to
establish Kutak's breach of duty via expert testimony.  Even
putting aside the fact that the evidentiary hearing was not a
full-blown trial and given the parameters set by the court it was
impossible for the FDIC to call each and every witness it wanted
to call regarding Kutak's alleged malpractice, expert testimony
is not <u>required</u>.  <u>See</u> <u>Sheetz v. Bowles Rice McDavid Graff & Love</u>,
547 S.E.2d 256, 271-72 (W. Va. 2001) (answering certified
question "Does West Virginia law allow the use of lawyers as
experts in legal malpractice case?" in the affirmative).

"As in all damages awards for tortious injury, `[i]nsistence on mathematical precision would be illusory and the judge or juror must be allowed a fair latitude to make reasonable approximations guided by judgment and practical experience.'" Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 590 (1974) (quoting Whitaker v. Blidberg Rothchild Co., 296 F.2d 554, 555 (4th Cir. 1961)); Cf. Baughman v. Cooper-Jarrett, Inc., 391 F. Supp. 671, 680 (W.D. Pa. 1975), aff'd in part, vacated in part on other grounds, 530 F.2d 529 (3d Cir. 1976) ("Damages in a case such as this are seldom capable of precise determination. . . .").

"[I]f a plaintiff can demonstrate that the defendant's acts caused him economic loss and so establish liability, the plaintiff will also be able to establish `facts and circumstances tending to show the probable amount of . . . damages' sufficient to allow the trier of fact to form a `reasonable and probable estimate' of recoverable damages." Miller v. Asenio & Co., Inc., 364 F.3d 223, 231 (4th Cir. 2004) (quoting Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555, 565 (1931)). "If a plaintiff proves liability and damages which are definitively attributable to the wrong, a jury's award of damages will be upheld even if there is some uncertainty as to their amount." Id. (internal citations and quotations omitted); see also Smith v. White, 87 S.E. 865, 866 (W. Va. 1916) ("[A]lthough the damages

35

are substantial, the amount is largely a matter of conjecture, and all the court can_do is to determine, from the conflicting evidence, such an amount as, in its judgment, is reasonable."); Pickens v. Coal River Boom & Timber Co., 50 S.E. 872, 875 (W. Va. 1905) ("And where, from the nature of the case, the amount of damages cannot be estimated with certainty, or only a part of them can be so estimated, we can see no objection to placing before the jury all the facts and circumstances of the case having any tendency to show damages, or their probable amount, so as to enable them to make the most intelligible and probable estimate which the nature of the case will admit.").

In its mediation statement, prepared on April 19, 2002, the FDIC contended that its claims against Kutak were in excess of $200 million.  FDIC Ex. 2128.  REDACTED

At the evidentiary hearing, the FDIC offered the testimony of damages expert Harry Potter to calculate the amount of damages suffered by the Bank that were attributable to Kutak.  Potter, adopted a cash in, cash out methodology to measure the damages caused by 13 securitizations, Keystone's acquisition of Prime Financial, and operating losses.  Potter, November 87, 2007, Tr. at 291-95.  As the court concluded in its March 14, 2007 Findings and Conclusions, this method is "entirely consistent with applicable case law regarding how to quantify damages in a case of this nature."

36

The evidence presented by the FDIC establishes that the continuation of the securitization program had disastrous consequences to Keystone and that the termination of the securitization program in early 1996[10] would have avoided losses to Keystone of $261,333,795.53 directly caused by the securitization program; $14,565,889.67 in connection with the Prime transaction, and another $17 million in operating losses from early November 1998 until the closure of the Bank.  FDIC Exs. 633, 2156, 2158; Potter, November 28, 2007, Tr. at 300-17, 322-23.

To compute the damages on each securitization, Potter took the negative cash flow at the closing of each securitization in question and applied to that figure a ten percent interest rate from the closing date until April 30, 2004 - the month-end immediately preceding the beginning of the underlying trial against Grant Thornton.  The ten percent reflects the need for the securitizations to generate a recovery of both the cost of funds invested in the transaction and the expense incurred to run the securitization program.  From that amount, Potter subtracted any residual collections on the date of collection from the total

---

[10] Although Mr. Potter computed damages based on losses from 13 securitizations, the court has concluded that the more appropriate damage figure would include losses stemming from the last 9 securitizations, representing the point in time or "tipping point" by which time Lambert should have gone to Keystone's Board.

37

negative cash flow plus interest on that date.  He subtracted the
collection first from any accrued interest before subtracting it
from the principal negative cash flow, an approach that is
consistent with normal and accepted standards of crediting
payments against a balance owed.  Any residual collections
received after April 30, 2004, were discounted back to that date
using a discount rate of five percent to more closely reflect the
cost of funds of the bank at the time it closed and to reflect
the fact that the future residual recoveries were more certain at
that time than before the Bank closed.  FDIC Ex. 2156, Potter,
November 28, 2007, Tr. at 291-305, 405.

The court does not believe the securitization damages
computed by Potter should be adjusted downward because of market
conditions that might have affected the values of Keystone's
residual interests.  First, changes in residual values due to
global market forces are foreseeable and, thus, even if such
changes caused an increase in damages, those damages would be
recoverable.  Potter, November 28, 2007, Tr. at 320-21.  Second,
as the court stated in its original findings, it was the "risky
nature of many of the underlying loans" that doomed the
securitization program and the corresponding residual interests
held by Keystone - not global market conditions.  Moreover, the
FDIC's efforts in receivership actually resulted in a greater
recovery on the residuals than selling the residuals at the

38

Bank's closure would have.  Potter, November 28, 2007, Tr. at
321.

Potter computed the damage to Keystone from its acquisition
of Prime Financial by taking the various cash outflows sustained
as a result of purchasing and owning Prime and subtracted from
that amount the cash inflows resulting from Keystone's ownership
of Prime as well as an estimated value of Prime.  To this amount,
Potter applied an interest rate of ten percent from October 15,
1997 to November 30, 2004.  FDIC Ex. 2158; Potter, November 28,
2007, Tr. at 307-09.

Potter computed the operating losses in the same manner as
in the underlying trial, i.e., tallying the foreseeable payments
that Keystone would not have made if the Bank had ceased
operations as of early November 1998 and subtracting those
revenues that would not have been received if the Bank had ceased
operations, to arrive at a figure of $62,089,752.  FDIC Ex. 633,
Potter, November 28, 2007, Tr. at 296, 309-12.  The $62 million
in operating losses includes the $25,080,777 in operating losses
that the court calculated as damages against Grant Thornton.  As
in the damages related to the securitizations and the purchase of
Prime, a significant portion of the $62 million dollars in
operating losses is interest expense.  Potter, November 28, 2007,
Tr. at 309-12.  In order to avoid the possibility of double
counting, $45 million in interest expense has been deducted from

39

the $62 million, resulting in operating expenses of approximately $17 million.  Potter, November 28, 2007, Tr. at 309-12.

From the evidence presented by the FDIC, including Potter's analysis as discussed above, the court finds that Kutak is responsible for $292,899,685.20 in damages and concludes that, in determining the credit to be given Grant Thornton, the FDIC/Kutak settlement should thus be allocated proportionally to such damages.

The objective of compensatory damages under West Virginia law is not to adopt a certain methodology, but to place the injured party in the position it would have been absent the tortious conduct.  Accordingly, the Court concludes that the FDIC's damage computation, as modified herein, is a reasonable and proper quantification of Keystone's damages stemming from Kutak's misconduct.

### VIII.  One Satisfaction Rule

Under West Virginia law, "a non-settling defendant's right of contribution from a joint tortfeasor is terminated by a settlement between the plaintiff and such tortfeasor before verdict."  Smith v. Monongahela Power Co., 429 S.E.2d 643, 648 (W. Va. 1993); see also Board of Education of McDowell County v. Zando, Martin & Milstead, Inc., 390 S.E.2d 796, 805 (W. Va. 1990) ("[A] party in a civil action who has made a good faith settlement with the plaintiff prior to a judicial determination

of liability is relieved from any liability for contribution.").

In Cook v. Stansell, 411 S.E.2d 844, 846 (W. Va. 1991), the court

elaborated on the rule of Zando, stating that:

> [W]hen a settlement is entered into between a
> non-party and a claimant prior to the
> institution of the suit, a defendant in the
> suit cannot implead the non-party in a
> subsequently filed civil action, so long as
> the settlement was entered into in good faith
> and the amount of the settlement was
> disclosed to the trial court for verdict
> reduction.

A non-settling defendant is not without recourse,

however, as

> Defendants in a civil action against whom a
> verdict is rendered are entitled to have the
> verdict reduced by the amount of any good
> faith settlements previously made with the
> plaintiff by other jointly liable parties.
> Those defendants against whom the verdict is
> rendered are jointly and severally liable to
> the plaintiff for payment of the remainder of
> the verdict.  Where the relative fault of the
> non-settling defendants has been determined,
> they may seek contribution among themselves
> after judgment if forced to pay more than
> their allocated share of the verdict.

Zando, 390 S.E.2d at 806.

The practice of granting a settlement credit is "premised on

the principle that a plaintiff is entitled to one but only one

satisfaction for his injury."  Board of Education of McDowell

County v. Zando, Martin & Milstead, Inc., 390 S.E.2d 796, 803 (W.

Va. 1990).  The "one satisfaction" rule applies only where the

conduct of the defendants resulted in a single indivisible

injury.  Boyett v. Keene Corp., 815 F. Supp. 204, 208 (E.D. Tex. 1993) ("[A]mounts recovered from a settling defendant should be applied as a credit against the amount recovered by the plaintiff from a non-settling defendant, provided that both the settlement and the judgment represent common damages.").  By contrast, where two or more defendants are responsible for separate injuries, an amount received in settlement from one defendant for one of the injuries may not be used to reduce the liability of the other defendant for the other injuries.  Id. at 208, 212 (finding plaintiff entitled to entire amount of jury verdict without offset where there was no evidence that any portion of settlement was allocated to common damages).

### VIII.  Divisibility of Damages

1.  Divisibility of damages is discussed in the Restatement (Third) of Torts § 26.  Comments f and g to section 26 provide:

> f.  *Divisible damages*.  Whether damages can be divided by causation is a question of fact.  The fact that the magnitude of each indivisible component part cannot be determined with precision does not mean that the damages are indivisible.  All that is required is a reasonable basis for dividing the damages. . . .
>
> Divisible damages can occur in a variety of circumstances.  They can occur when one person caused all of the damages and another person caused only part of the damages.  They can occur when the parties caused one part of the damages and nontortious conduct caused another part.  They can occur when the nontortious conduct occurred before or after the parties' tortious conduct.  They can occur in cases involving serial injuries, regardless of the length of time between the injuries.  They can occur when the plaintiff's own conduct caused part of the damages.

42

Dividing damages by causation among different tortious acts by the same person may be required.  When a person commits two or more tortious acts that cause different parts of the damages, each tortious act is treated separately.

g.  *Indivisible injuries*.  Damages are indivisible, and thus the injury is indivisible, when all legally culpable conduct of the plaintiff and every tortious act of the defendants and other relevant persons caused all of the damages.  Unless sufficient evidence permits the factfinder to determine that damages are divisible, they are indivisible.

The Notes to the Restatement clarify these points:

*Comment f.  Divisible damages*.  Topic 5 applies to divisible damages.  Determining what constitutes divisible damages requires understanding of the applicable rules of legal causation, including the "but for" test and the "substantial factor" test.  <u>See</u> Restatement Second, Torts § 432(2); Comments k, l.  The substance of those rules is beyond the scope of this Restatement. . . .

Divisible damages may occur when a part of the damages was caused by one set of persons in an initial accident and was then later enhanced by a different set of persons.  The passage of time may affect whether evidence is available to determine the magnitude of each indivisible part.  As long as any person caused only a part of damages, however, the damages are divisible, irrespective of the timing.

Comment g.  Indivisible injuries.  Apportionment of indivisible injuries is determined by Topics 1-4.  Determining what constitutes divisible damages necessarily requires understanding of what constitutes an indivisible injury.  Moreover, after divisible damages are divided into their component parts, the component parts may have been caused by two or more persons.  Apportionment of liability for these indivisible parts is determined by Topics 1-4.  Thus, applying the rules stated in this Topic requires an understanding of what constitutes an indivisible injury.

> An indivisible injury is one in which the entire
> damages were caused by every legally culpable act of
> each person.  As with divisible damages, that
> determination requires a predicate understanding of the
> applicable rules of causation, including the "but for"
> test and the "substantial factor" test. . . .

Applying this definition to this situation, it is clear that the FDIC's claims against Kutak for the $25 million in damages for which Grant Thornton has been found liable are divisible from its claims for damages against Kutak for the remaining losses to the Bank because "one person [Kutak] caused all of the damages and another person [Grant Thornton] caused only part of the damages."  Potter, November 28, 2007, 326-27.  Conversely, Grant Thornton did not cause all of the $565 million in damages suffered by Keystone – only the $25 million found by the court.

In determining whether to award a settlement credit, West Virginia courts have recognized the necessity of determining whether the damages are divisible.  In Biro v. Fairmont General Hospital, Inc., 400 S.E.2d 893 (W. Va. 1990), Biro was admitted to the hospital for a hysterectomy.  See id. at 895.  Shortly after surgery, Biro claimed she was experiencing numbness in her legs which, according to her, was caused by the physician who performed her hysterectomy negligently compressing her femoral nerve during surgery.  See id.  Also, during her hospital stay, Biro alleged that she injured her right knee while being assisted to the bathroom by two of the hospital's nurses.

44

Biro filed suit against both the hospital and the physician performing the hysterectomy. See id. Prior to trial, the physician settled for $30,000. See id. at 894-95. Finding in favor of plaintiff on her claim against the hospital, the jury awarded approximately $100,000 in damages to Biro and her husband. See id. The trial court offset the jury verdict by the full amount of the settlement with the physician. See id.

The Supreme Court of Appeals of West Virginia reversed the lower court and found that the evidence did not establish that the injury to Biro's knee as a result of the fall in her hospital room, combined with the alleged femoral nerve injury sustained during her hysterectomy, constituted a single indivisible loss resulting from actions of the hospital and the physician performing the hysterectomy. See id. at 896-97. The court did so despite the existence of medical evidence suggesting that Biro's fall was the result of weakness in her leg that had been caused by compressions of the femoral nerve during surgery. See id. at 895. The Biro court concluded "that the malpractice claim [was] a separate cause-of-action, and thus divisible, from the negligence on the part of the hospital." Id. at 896.

In Johnson v. General Motors, 438 S.E.2d 28, 31 (W. Va. 1993), the plaintiff minors suffered injuries while in the back seat of a GM vehicle that was hit head on by a vehicle that was going the wrong way on the highway. After settling with the driver of the other vehicle and the underinsurance carrier

45

insuring the car in which they were passengers, plaintiffs proceeded to trial on their crashworthiness claim against GM. See id. After the jury returned a verdict in favor of the plaintiffs, the trial court set-off from the verdict the amount of the settlements. See id. at 32. The appellate court reversed the trial court, holding that GM was not entitled to a credit for plaintiff's settlement with the other driver because the injuries suffered in the initial collision were divisible from the injuries suffered as a result of the GM vehicle not being equipped with a combination lap/shoulder belt. See id. at 33-35.

In support of its argument that the damages herein are indivisible, Grant Thornton relies on the case of City of San Jose v. Price Waterhouse, 1993 WL 83495 (9th Cir. 1993) (unpublished), an unpublished decision from the Ninth Circuit. In City of San Jose, the City filed suit against Price Waterhouse and thirteen securities dealers, alleging that the dealers had engaged in numerous high risk investments and that Price Waterhouse, the City's accounting firm, breached its professional duties in failing to report the transactions. 1993 WL 83495, *1 (9th Cir. 1993). The City settled with all the securities dealers and obtained a jury verdict against Price Waterhouse in the amount of $517,669. Id. Price Waterhouse appealed the trial court's failure to allow an offset of the jury verdict with the previous settlements. Id. Citing the one satisfaction rule, the

46

Ninth Circuit held that because there was some commonality in
damages between the jury verdict and the settlements that Price
Waterhouse was entitled to an offset.  Id. at *2-3.

Grant Thornton argues that City of San Jose stands for the
proposition that where there is even a small overlap in damages
the damages are indivisible and a nonsettling defendant is
entitled to the benefit of an offset for the entire amount of the
settlement.  Admittedly the position advanced by Grant Thornton
is appealing for its simplicity of application.  However, to
paraphrase H.L. Mencken, for every complex problem, there is a
solution that is simple, neat and wrong.  To adopt Grant
Thornton's position - - that it is entitled to a credit in the
full amount of the Kutak settlement under the facts and
circumstances of this case - - would only serve to confirm
Mencken's proposition.  Although the FDIC is entitled to only one
satisfaction, it is entitled to one **full** satisfaction.

## IX.  Independent Allocation

According to Grant Thornton, under the one satisfaction rule
and the rule of Zando, the failure of the FDIC and Kutak to make
an allocation in the settlement agreement requires the court to
award a settlement credit in the full face amount of the
settlement.  However, application of those rules "does not
require [this court] to abandon the rule of reason." CACI
International, Inc. v. St. Paul Fire and Marine Ins. Co., 2009 WL

1336611, *9 (4th Cir. 2009) (concluding that application of
Virginia's potentiality rule in insurance context did not require
court to abandon rule of reason or short time exception to
insurance coverage would "swallow the policies' coverage
provisions whole").

This court is required to make an independent allocation of
the settlement with Kutak.  The necessity for a court to make an
allocation of the amount of a settlement to be applied to a later
judgment has been considered numerous times in the bankruptcy
context.

In Bowers v. Kuse, 1998 WL 957455, *2 (4th Cir. 1998)
(unpublished), a bankruptcy trustee settled claims against a
defendant bank for recovery of 18 allegedly fraudulent transfers.
The trustee obtained summary judgment in the amount of $595,000
against a non-settling defendant, Kuse, on two of the 18
transfers.  Id. at *1.  Relying on the one satisfaction rule
codified in Section 550(d) of the Bankruptcy Code,[11] Kuse sought
a credit for the full amount of the settlement.  Id. at *2.  The
settlement agreement between the trustee and the bank included a

_____

[11] Although more than one creditor may be held responsible
for a single avoidable transaction under 11 U.S.C. 550(a),
section 550(d) limits the right of the trustee to recover from
those multiple sources insofar as he is entitled to only one
satisfaction for each preference claim.  See 11 U.S.C. § 550(d)
("The trustee is entitled to only a single satisfaction under
subsection (a) of this section."); see also In re H&S
Transportation Co., Inc., 939 F.2d 355, 358 (6th Cir. 1991).

general release and made no allocation of the settlement proceeds among the various settled claims.  Id. at *2.  The bankruptcy court found that the two claims against the settling defendant for the same preferences for which the non-settling defendant had been found liable were valueless, and thus no credit was available.  Id. at *2, 6.  The district court reversed the bankruptcy court and held that Kuse was entitled to a credit for the full amount of the settlement because the release encompassed the two transfers for which the non-settling defendant had been liable.  Id. at *2, 6.  In so doing, the district court reduced the non-settling defendant's liability to zero.  Id. at *2.

Relying on the decision of the United States Court of Appeals for the Ninth Circuit in Sims v. DeArmond (In re Lendvest Mortgage, Inc.), 42 F.3d 1181, 1182 (9th Cir. 1994), the Fourth Circuit reversed the district court and reinstated the judgment of the bankruptcy court.  Id. at *8.  The Fourth Circuit noted that the parties' allocation of the settlement proceeds among claims "is virtually meaningless and may not reasonably reflect the parties' relative liabilities."  Id. at *7 (quoting Lendvest Mortgage, 42 F.3d at 1184).  The appeals court also held that the bankruptcy court "must undertake an independent allocation of the settlement."  Id. at *7.  The Fourth Circuit found no error in the bankruptcy court's determination, based on its knowledge of the settlement negotiations and the terms of the settlement

49

agreement, that the trustee's claims against the bank for the overlapping transfers were valueless.  Id. at *7-8.  Therefore, the bankruptcy court did not err in allowing no credit to Kuse. Id. at *7-8.

In Sims v. DeArmond (In re Lendvest Mortgage, Inc.), 42 F.3d 1181, 1182 (9th Cir. 1994), a bankruptcy trustee settled claims with Lendvest for the same preferential transfer on which the trustee sought a judgment against the DeArmonds.  Although the trustee's settlement with Lendvest also "encompassed many claims for which the DeArmonds were not jointly liable," the bankruptcy court granted the DeArmonds a credit for the full amount of the settlement and dismissed the trustee's case against them.  Id. at 1184.  The bankruptcy appellate panel reversed the bankruptcy court and the Ninth Circuit Court of Appeals affirmed.  Id. at 1182.  First, the appeals court rejected the DeArmonds' contention, also advanced by Grant Thornton in this case, that lack of an allocation of the settlement proceeds in the settlement agreement resulted in credit to the nonsettling defendant for the full amount of the settlement proceeds.  Id. at 1183-84.  The court stated that such agreed allocations were viewed "with considerable suspicion because of the risk that liability may have been allocated for strategic reasons."  Id. at 1184 (quoting Slottow v. American Casualty Co., 10 F.3d 1355, 1359 (9th Cir. 1993)).  The court then held "that the bankruptcy

court must undertake an independent allocation of the settlement." Id. at 1185.  In describing how the allocation should be made, the court stated that "any court approving an allocation of a settlement must delve into the strength of the claims.  The merit of the claims and the ability to pay are the primary determinants of settlement value.  Id. at 1184.

In Connecticut General Life Ins. Co. v. New Images of Beverly Hills, 257 Fed. Appx. 49, 51-52 (9th Cir. 2007), the Ninth Circuit reversed a lower court decision to offset a jury verdict against one defendant with the settlements of other defendants where the court did not undertake an independent allocation of the settlement payments.  Plaintiff had obtained a $2.9 million judgment against the defendant but the district court found that the judgment had been satisfied when it granted defendant a settlement credit in the full amount of the judgments with seven other defendants.  See id. at 51.  According to the appellate court:

> Here the underlying fraud was perpetrated at ten
> separate surgery clinics over a five-year period.  The
> seven settling defendants engaged in fraudulent
> activities at different clinics and at different times;
> [defendant] was a participant only at [one clinic] and
> only during part of the time that the fraud was
> occurring there.  The judgment was for damages suffered
> on account of [defendant's] activities at [the one
> clinic].  This suggests that not all of the settlement
> payments overlap or are in common with the [ ] judgment
> [against defendant].  In these circumstances, Sims
> requires the court to attempt an allocation of whether
> or not the settling parties themselves have done so.
> Sims, 42 F.3d at 1185.

51

Id. at 51.

In In re Prudential of Florida Leasing, Inc., 478 F.3d 1291, 1295 (11th Cir. 2007), the bankruptcy trustee obtained a $3.9 million settlement of a lawsuit involving 377 allegedly fraudulent transfers made by debtor.  Later, the trustee filed a complaint against a defendant who had not been named in the first suit, seeking to recover approximately $900,000 and arguing that the defendant was a transferee of 11 of the 377 fraudulent transfers at issue in the settled lawsuit.  See id. at 1296. "Because the parties to the settlement had not specified an exact amount of settlement for each claim," the bankruptcy court credited the entire amount of the $3.9 million settlement to the trustee's claims against the defendant for $900,000.  See id.

In reversing the bankruptcy court's decision, the Eleventh Circuit held that the bankruptcy court was required to allocate the amount of the settlement that applied to the later complaint. See id. at 1302.  The court further found that the "single satisfaction" rule, codified at § 550(d) of the Bankruptcy Code, should not be read to abrogate the right of a trustee to collect the full value of a preferential or fraudulent transfer.  See id. at 1301 ("Although we admit the rule proposed by defendant [offset for full amount of settlement] would prevent even the possibility of double recovery, that rule would also prevent a complete satisfaction in many instances.").  The Prudential court

52

further instructed that "[w]hen the amount for which a cause of action has been settled in unclear because the settlement involved multiple injuries, claims, and parties, [the single satisfaction rule] requires a bankruptcy court to arrive at an equitable valuation of that cause of action as a percentage of the total settlement amount." See id. at 1302.

In Tazewell Oil Company, Inc. v. United Virginia Bank, 413 S.E. 2d 611, 617 (Va. 1992), the plaintiff sued three banks for various acts of creditor misconduct resulting in the wrongful destruction of the plaintiff's business, the wrongful seizure of the plaintiff's inventory, and the wrongful dishonor of plaintiff's checks. Plaintiff settled with two of the banks and obtained a jury verdict against the third bank. Id. at 617. The trial court allowed the non-settling defendant a credit for the full amount of the settlements. Id. at 617. The Virginia Supreme Court reversed and remanded to the trial court for an allocation of the settlement amounts among the multiple injuries to the plaintiff. Id. at 622-23. "[T]he court must look at the injury or damage covered by the release, and, if more than a single injury, allocate, if possible, the appropriate amount of compensation for each injury." Id. at 622.

## X.  Amount of Settlement Credit

"Under the one satisfaction rule, "an injured party is ordinarily entitled to only one satisfaction for each injury."

Prudential-Bache Securities, Inc. v. Kaypro Corp., 884 F.2d 1222, 1230 (9th Cir. 1989), cert. denied, 111 S. Ct. 232 (1990) (citations omitted).  Thus a non-settling co-defendant is entitled to a credit, or offset, for amounts paid by a settling co-defendant, "provided both the settlement and the judgment represent common damages."  U.S. Industries, Inc. v. Touche Ross & Co., 854 F.2d 1223, 1236 (10th Cir. 1988); see also Sykes v. Duda & Sons, Inc., 940 F.2d 1536, *2-3 (9th Cir. 1991) (unpublished) (remanding for allocation of settlement to determine offset amount).

The case of Baughman v. Cooper-Jarrett, Inc., 391 F. Supp. 671, 680 (W.D. Pa. 1975), aff'd in part, vacated in part on other grounds, 530 F.2d 529 (3d Cir. 1976), is instructive on the procedure to be used in calculating the amount of a settlement credit to be applied to a verdict.  Plaintiff Baughman brought a civil antitrust action against his former employer and four other trucking companies.  Id. at 673.  Plaintiff settled with two of the defendants prior to trial for $60,000.  Id. at 673-74.  The jury returned a verdict of $25,000 against the remaining defendant which, pursuant to applicable law, was trebled and resulted in a total judgment of $75,000.  Id. at 674.  The nonsettling defendant filed a motion to reduce the judgment to $15,000, arguing that it was entitled to an offset of $60,000. Id.

54

Concluding that it had to determine the overlap between the settlement amount and the judgment, the court attempted to ascertain the total amount of damages suffered by the plaintiff. Id. at 678-80.  The court determined that there were two applicable damages windows - - (1) damages arising up to and including August 24, 1971; and (2) damages occurring after August 24, 1971.  Id. at 679.  The court found the $25,000 jury verdict represented those damages incurred during the second damage window and estimated damages in the first damage window were $5,200, for a total damage figure of $30,200.  Id. at 680.

Because the $60,000 settlement was paid in settlement of all plaintiff's damages and covered both damage windows, the court undertook to determine the percentage of the total damages applicable to the second damage window, i.e., incurred after August 24, 1971.  Id.  The court concluded that 83 percent of the total damages were suffered after August 24, 1971.  Id.  Eighty-three percent of the settlement amount was $49,800, which the court determined was the proper amount to be credited to the judgement against defendant.  Id.  Accordingly, the court reduced the $75,000 judgment (jury verdict of $25,000 trebled) to $25,200.  Id.

Baughman is particularly instructive here because, as in that case, the damages that Kutak settled encompass a period of time greater than that for which Grant Thornton was found liable.

55

In this case while there is an overlap in damages it does not
prohibit the court from making an allocation.  "This is not a
situation where there is a single discrete injury, or where it
appears impossible on the face of things for the court to make an
allocation."  Connecticut General Life Ins. Co. v. New Images of
Beverly Hills, 257 Fed. Appx. 49, 51-52 (9th Cir. 2007).  In this
case, there were losses related to the securitizations, losses
relating to the sale of Prime, and operating losses.  The FDIC
had strong claims against Kutak for all of these damages while
the only damages Grant Thornton was found liable for were the
operating losses from the time it issued its audit report in
April of 1999 until the closure of the Bank.

Even though it is unlikely that the FDIC will ever realize
the full face amount of its settlement with Kutak, i.e.,
$22,000,000, because of the Reliance receivership, Grant Thornton
nevertheless argues that it is entitled to a settlement credit in
the full $22,000,000.  The court finds persuasive the reasoning
of Garcia v. Duro Dyne Corp., 156 Cal. App. 4th 92 (2007).  In
that case, Garcia and his wife brought a personal injury and loss
of consortium action against numerous defendants after Garcia
developed mesothelioma.  Id. at 95.  Plaintiffs settled their
claims with most of the defendants before trial but went to trial
against two defendants, including Duro Dyne.  Id. at 95.  The
jury returned a verdict for plaintiffs on their claims against

56

Duro Dyne in the amount of $1,905,619.32.  Id. at 95.  Duro Dyne

contended that it was entitled to an offset of that portion of

the settlements representing common damages, even though

settlement monies had not been paid in certain cases.  Id. at 99.

While the trial court granted an offset against Duro Dyne's

judgment for certain of the settlements, it refused to do so for

settlement monies that had not yet been paid.  Id. at 96.

In affirming the decision of the lower court, the appellate

court noted:

> To allow a nonsettling defendant who proceeded to trial
> and was found liable to reduce the award against it in
> the amount of a settlement that has not yet been paid
> would deprive the injured plaintiff of an award to
> which he or she is presently entitled, and penalize the
> plaintiff for having settled the claims against some of
> the defendants.  Such a result would frustrate the
> policy of splitting an award of damages among the
> parties at fault by placing the burden of an unpaid
> settlement on the innocent plaintiff.

Id. at 101.  The court further concluded that credit should be

given only for the amount received, but that the court should

retain jurisdiction to award future credits if and when

additional payments are made.  Id. at 101-02.

Tommy's Elbow Room, Inc. v. Kavorkian, 754 P.2d 243 (Alaska

1988), is the main authority relied upon by Grant Thornton in

support of its position.  In that case, plaintiff settled a

wrongful death and personal action with two of three joint

tortfeasors.  Id. at 244.  One of the defendants settled for

$1,230,000, but that amount was contingent on recovery against

57

that defendant's insurer.  Id.  The Alaska Supreme Court held
that, contingent or not, the entire $1,230,000 should offset the
jury verdict.  Id. at 246-47.  In Zando, the West Virginia
Supreme Court of Appeals cited Tommy's Elbow Room in support of
another proposition but did not discuss the holding at issue
herein.  See Board of Education of McDowell County v. Zando,
Martin & Milstead, Inc., 390 S.E. 2d 796 (W. Va. 1990).

     The Ninth Circuit has persuasively explained the flaw in
Tommy's Elbow Room.  See Federal Savings and Loan Ins. Corp. v.
Butler, 904 F.2d 505, 514-15 (9th Cir. 1990).  Finding that the
holding in Tommy's Elbow Room was rooted in a misconstruction of
the Uniform Contribution Among Tortfeasors Act, the Butler court
rejected the holding in Tommy's Elbow Room.  Id. at 515.

     Other courts that have considered the issue have likewise
rejected the holding in Tommy's Elbow Room.  See, e.g.,
Fibreboard Corp. v. Fenton, 845 P.2d 1168, 1175-77 (Colo. 1993)
(holding that nonsettling defendant's right of setoff is limited
to amounts actually collected from settling defendants and does
not include amounts provided for in settlement agreements that
have not been paid; holding "properly allocated the risk that no
amounts under the settlement agreement will be paid to the guilty
tortfeasors rather than the innocent injured party"); see also In
re Joint Eastern and Southern Districts Asbestos Litig., 798 F.
Supp. 940, 953 (E.D.N.Y. 1992), reversed on other grounds, 995

F.2d 343 (1993) (concluding that New York would likely follow Butler and not Tommy's Elbow Room).

The court predicts that West Virginia's highest court would follow the approach taken in Butler, Garcia, and Fenton and only allow a settlement credit against a verdict for settlement amounts that are actually realized by a plaintiff. See Savage v. Booth, 468 S.E.2d 318, 323 (W. Va. 1996) ("It is clear in West Virginia that when a settlement agreement is reached with one joint tort-feasor other joint tort-feasors are entitled to receive credit for the settlement amount paid.") (emphasis added). Such an approach is consistent with promoting West Virginia's policy of insuring that an injured plaintiff receives "one, but only one, complete satisfaction for his injury." Zando, 390 S.E.2d at 803 (and authorities cited therein) (emphasis added). Application of Tommy's Elbow Room in this case would deprive the FDIC of the complete satisfaction to which it is entitled. As the trial court in Garcia put it, "I can't believe that the statute intends to give credit to a settlement that's never going to be paid. That doesn't make any sense. . . . I can't, for the sake of me, think that the statute says, well, it doesn't matter as long as you had a written agreement, it doesn't matter if you ever collect it or not. One of the responsible parties gets a credit for that just because you

entered into an agreement." <u>Garcia v. Duro Dyne Corp.</u>, 156 Cal. App. 4th 92, 97 (2007).

Based on the foregoing analysis, the court concludes that the appropriate credit to be awarded to Grant Thornton at this time is $1,343,750.57, which is the product of multiplying the amount received to date[12] plus additional guaranteed recovery[13] ($15,692,521) times the ratio of damages caused by Grant Thornton ($25,080,777) to the total damages for which the FDIC had substantial evidence that Kutak would have been found liable ($292,899,685.20), i.e., 8.5630%. Potter, November 28, 2007, Tr. at 332-33.

Accordingly, the court will enter a final judgment against Grant Thornton in the amount of $23,737,026.43. This amount shall bear interest at the legal post-judgment rate from the date of this order until paid.

If and when the FDIC receives additional payments under the FDIC/Kutak settlement, it shall promptly notify the court, at which time Grant Thornton will receive a credit of 8.5630% of any payment against the judgment balance outstanding on the date the FDIC receives the payment. If at the time the FDIC receives additional payments under the settlement agreement, the FDIC has

---

[12] $12,942,521

[13] $2,750,000

already received payment in full of the judgment, the FDIC shall refund 8.5630% of each such additional payment to Grant Thornton.

**CONCLUSION**

An amended judgment will be entered, pursuant to Federal Rule of Civil Procedure 58, in accord with the foregoing findings of fact and conclusions of law.  The Clerk is directed to file this document and to send a copy to counsel of record.  The court is further directed to SEAL[14] Exhibit 1 (the unredacted Supplemental Findings of Fact and Conclusions of Law) and to send a copy to counsel of record.

**IT IS SO ORDERED** this 10th day of March, 2010.

ENTER:

David A. Faber
Senior United States District Judge

---

[14] Because the ATS memo was filed under seal and the courtroom was sealed when it was discussed, the court has sealed this document given the discussion of the ATS memo herein.